AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
SEP 0 8 2017
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. |
| One iPhone 6 Cellular Phone | ) | '17 MJ 3275 |
| Model A1549 | ) | |
| IMEI number 359302068003919 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-2 (incorporated herein)

located in the   Southern   District of   California  , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B-2 (incorporated herein)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC Section 2320 | Trafficking of Counterfeit Goods or Services |

The application is based on these facts:
See attached affidavit of Matthew Brackett, Special Agent, Department of Homeland Security, Office of Inspector General

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Matthew Brackett
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  9/8/17

*Judge's signature*

City and state: San Diego, California

Hon. Barbara L. Major
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Matthew S. Brackett, a Special Agent with the United States Department of Homeland Security, Office of the Inspector General, having been duly sworn, hereby state as follows:

### I.

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of a counterfeit goods smuggling investigation for the following target property:

    a. An iPhone 7 Plus cellular telephone, Model A1784, IMEI number 35 921907 067226 9 ("SUBJECT DEVICE #1") as described in Attachment A-1; and

    b. An iPhone 6 cellular telephone, Model A1549 IMEI Number 35 930206800391 9 ("SUBJECT DEVICE #2") as described in Attachment A-2 (together "SUBJECT DEVICES").

2. The SUBJECT DEVICES were seized incident to the arrest of United States Border Patrol Agent Martin Macias for violating California Penal Code section 350(a)(2), Possession and Sales of Counterfeit Goods, and the subsequent search of Macias' home pursuant to a California State Search Warrant. Based on my training and experience, my knowledge of the DHS Office of Inspector General (OIG) and San Diego County Sheriff's investigation of Macias to date, and as discussed more fully below, there is probable cause to believe that Macias conducted sales of counterfeit items using the SUBJECT DEVICES and that the SUBJECT DEVICES will contain evidence of violations of Title 18, United States Code, Section 2320, Trafficking of Counterfeit Goods or Services (herein referred to as the SUBJECT OFFENSE).

3. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. In addition, the information

contained in this affidavit is based upon review of various official reports, upon conversations with other Federal Agents and law enforcement officers, and my personal observations and knowledge.

## II.

## EXPERIENCE

4. I am a Special Agent (SA) with the United States Department of Homeland Security (DHS), Office of Inspector General (OIG), and have been so employed since March 2017. I am assigned to the Office of Investigations, San Diego Field Office. In this assignment, my primary responsibility is to investigate allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs. Additionally, I am responsible for providing oversight and monitoring the investigative activity of various DHS internal affairs offices.

5. Prior to joining DHS OIG, I was an Aviation Enforcement Agent (AEA) assigned to Customs and Border Protection (CBP), Air and Marine Operations (AMO) assigned to the Air and Marine Operations Center (AMOC) from April 2015 to March 2017 where I was responsible for generating information using investigative techniques including examining physical evidence, consulting law enforcement computer databases, and analyzing flight plans to assist in aviation and maritime investigations in and around the United States. Additionally, I served as a Task Force Officer (TFO) to Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), Assistant Special Agent in Charge (ASAC), Riverside/San Bernardino within the Narcotics and Financial Investigations Group known as the Inland Commercial Enforcement Financial Interdiction Team (ICEFIT).

6. Prior to joining the AMO, I was a Border Patrol Agent with the Intelligence Unit (BPA-I) from April 2009 to April of 2015 stationed in Laredo, Texas. As a BPA-I assigned to the South Texas Border Intelligence Center (STXBIC), I was primarily responsible for identifying intelligence targets for operational teams by collecting and preserving evidence related to ongoing investigations and subjects of interest. In addition, I conducted link analysis using various law enforcement systems and databases to include financial data systems to depict an individual's

2

associations to transnational organized crime, persons, facilities, activities, and events. My duties also included analyzing drug trafficking patterns along the southern border of the United States, apprehending drug traffickers, and interviewing drug smugglers, among other things.

7. I have specialized training and experience in drug trafficking, fraud, and conspiracy investigations. I attended and graduated from the Criminal Investigator Training Program held at the Federal Law Enforcement Training Centers in Glynco, Georgia. I have participated in numerous investigations involving public corruption, controlled substance violations, financial crimes, and counterfeit items, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, the use of court-ordered intercepts of wire and/or electronic communications, dialed number recorders (pen registers), telephone toll analysis, the arrests of violators, and the analysis of seized records, physical evidence, and taped conversations.

8. Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one, or all, of the following crimes: possession, distribution, possession with intent to distribute, importation, and manufacture of controlled substances, importation, manufacture, and sale of counterfeit marks, and related laundering of monetary instruments. I have been present during the execution of search warrants where controlled substances and or counterfeit marks were found. I have also spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of the inner workings of illicit organizations.

9. Based upon my training, experience, knowledge of this investigation, and conversations with other experienced investigators and law enforcement personnel, I know that:

    a. Persons who participate in the SUBJECT OFFENSE commonly possess, maintain, and keep evidence of their criminal activities (e.g., telephone numbers and names of co-conspirators, customers, and suppliers, shipping documents, correspondence, receipts, and ledgers noting the price, quantities, and times items were obtained, transferred, sold, distributed, and concealed) with them,

3

near them, and/or in their residences, vehicles, digital devices, and at other places they frequent. Moreover, these individuals typically maintain these records long after the initial transaction is completed for accountability purposes to their superiors and/or suppliers and to assist in collecting payment for the counterfeit items, which are sometimes supplied on credit. I am also aware that this type of evidence of illicit activities is often reflected in documents, files, and or communications stored or made on digital devices.

b. Persons who participate in the SUBJECT OFFENSE often communicate with their criminal associates using telephones, cellular telephones, pre-paid telephones, radios, and computers, and these digital devices often contain information such as contact numbers, messages, or other records that are relevant to the commission of criminal offenses.

c. Persons who participate in the SUBJECT OFFENSE often store evidence of their criminal activity on cellular phones, personal data assistants, computers, or other digital devices, in forms that may be as simple as customer lists or as elaborate as banking data tracking deposits from counterfeit-related transactions. In light of the universal popularity of computers and other electronic storage devices, large-scale counterfeiters often utilize electronic equipment, such as computers, facsimile machines, currency counting machines, pagers (digital display beepers), and telephone answering machines to generate, transfer, count, record and/or store all types of information relating to counterfeiting and any other illegal activities.

d. Since counterfeit proceeds are not usually safely disposed of legitimately (i.e., declared as taxable income), it is common for counterfeiters to keep documentation of their counterfeit proceeds in their electronic devices, which are often kept close to their person. This includes information regarding the concealment of funds, bank information, and documentation regarding wire

4

transfers, deposits, among other banking/financial transaction data relating to obtaining, transferring, secreting, or spending large sums of money acquired from the sale of counterfeit goods and other criminal activities. Persons who participate in the SUBJECT OFFENSE also often record information about vehicles and vessels they may use in the furtherance of their counterfeit sales on their phones.

e. It is also common for persons who participate in the SUBJECT OFFENSE maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the SUBJECT OFFENSE including documents related to the shipping of counterfeit goods. Evidence of the aforementioned books, records, receipts, notes, ledgers, etc., is often maintained by persons who participate in the SUBJECT OFFENSE in their electronic devices.

f. Persons who participate in the SUBJECT OFFENSE commonly maintain evidence relating to their obtaining, secreting, transferring, concealing, and/or spending of illicit proceeds, such as: large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, certificates of deposits, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other evidence of financial transactions. Evidence of these items is often maintained by persons who participate in the SUBJECT OFFENSE in their electronic devices.

g. Persons who participate in the SUBJECT OFFENSE may rent storage lockers to store counterfeit goods, and they often maintain possession (e.g., on their persons or in their residences or automobiles) documentation evidencing the rental of storage lockers on their electronic devices.

    h.    Persons who participate in the SUBJECT OFFENSE often take, or cause to be taken, photographs of themselves, their associates, their property and proceeds, their firearms and other weapons, and their counterfeit product; and these persons often maintain such photographs in their electronic devices.

    i.    Persons who participate in the SUBJECT OFFENSE often acquire and use security, communications, and counter-surveillance equipment. Information about the use of such equipment is often found on the electronic devices of persons who participate in the illicit purchase and sale of counterfeit items using the equipment.

    j.    Persons who participate in the SUBJECT OFFENSE often travel domestically and internationally to facilitate their illegal activities. They often maintain evidence of foreign and domestic travel by persons engaged in illegal counterfeiting and money laundering including travel itineraries, airline tickets, receipts related to travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and visas and their contents on their electronic devices.

    k.    Persons who participate in the SUBJECT OFFENSE commonly have on their electronic devices evidence of their possession of firearms, including, but not limited to, handguns, pistols, revolvers, shotguns, and machine guns, and other types of weapons. These firearms and weapons are used to protect and secure property of the counterfeiter, including without limitation, records, proceeds, and profits derived from the SUBJECT OFFENSE. In addition to preventing theft of this property, they maintain firearms to prevent being arrested and/or searched by law enforcement officers.

10.    Based upon the evidence set forth above and my training and experience, I believe that the Macias uses the SUBJECT DEVICES listed above in furtherance of the SUBJECT OFFENSE, and that the SUBJECT DEVICES may contain evidence of the SUBJECT OFFENSE.

## III.

## **PROBABLE CAUSE**

### A. Background on Investigative Consultants

11. "Investigative Consultants" (IC) is a private investigative company based out of Torrance, California that specializes in intellectual property violations. The company represents approximately 200 "world famous brands." IC's clients hire IC to find and investigate counterfeit products with the client's intellectual property. To enforce the trademark violations, IC's clients train IC's private investigators to identify genuine and counterfeit trademarked products. IC investigators then work with the client to identify counterfeit goods and to bring civil or criminal actions against those violating the company's trademark. Three IC investigators were involved in this case: Sacha Vafaeisefat, Jun-Hyuk Zadok Kim, and Scott Rogers.

### B. Initial Purchase

12. IC Investigator Vafaeisefat found a Craigslist advertisement selling Rolex watches with 619-836-2872 as the listed contact number on May 18, 2017. IC Investigator Kim texted the number listed on the Craigslist advertisement to ask about the Rolex watches for sale on May 23 and 24, 2017. The person replying to the text messages later identified himself as "Carlos." Carlos agreed to meet with IC Investigator Kim at the Target located in Mission Valley at 1288 Camino Del Rio North San Diego, California 92108. The San Diego County Sheriff's Department (SDCSD) later investigated the number and found it was associated with Carlos Eduardo Montes.

13. On May 25, 2017, a person identifying himself as "Martin" sent IC Investigator Kim messages from phone number 619-207-5685. "Martin" explained that he would be meeting with IC Investigator Kim instead of Carlos and that his white Volkswagen would be parked in the same Target parking lot. IC Investigators Kim and Rogers drove to Target later that day and met Macias, who was driving a white Volkswagen with California license plate 7UAE718.

14. While in the Target parking lot, Macias opened his car trunk that contained a display case with approximately four Audemars Piguet watches, four Cartier watches, and six Rolex watches. IC Investigators were able to taken some photographs of the watches. While IC

7

Investigators Kim and Rogers were looking at the watches, Macias confirmed that the watches were fake and said that every watch was $320. Martin confirmed that Carlos supplied him with watches and received new watches often. Martin explained that he preferred the Audemars Piguet watches and received them more often. Martin also claimed that he could provide large quantities of watches at wholesale prices. IC Investigator Kim purchased one Rolex watch for $320 cash. IC wrote a report summarizing their interactions with Carlos and Macias regarding this purchase.

**C.    Arrest**

15.    IC passed along its report to SDCSD's Border Crimes Suppression Team (BCST). The case was assigned to SDCSD BCST Detective Mike Bravo, who reviewed the report and photographs of the seller and vehicle. He searched for the owner of the white Volkswagen with California license plate 7UAE718 in the California Department Motor Vehicle database and compared it with images taken during the May 25, 2017 sale. Detective Bravo confirmed that Martin Macias was the seller in the photographs taken by IC Investigators and discovered that Martin Macias might be a Border Patrol Agent.

16.    On July 31, 2017, IC Investigator Kim texted Martin at 619-207-5685 and asked if he was still selling fake Rolex watches. Martin confirmed that he was and that he still had five fake Rolex watches for sale. IC Investigator Kim asked Martin if he could meet on August 1 or 2, 2017. Martin agreed to meet on August 2, 2017 at the same location, but the day of the meeting, Martin texted IC Investigator Kim to change the location to 1870 Main Court, Chula Vista, California. BCST detectives arrived early to monitor the interaction.

17.    IC Investigator Rogers met with Macias at around noon on August 2, 2017, in the Babies R Us parking lot located at 1870 Main Court, Chula Vista, California. Macias was driving a black Chevrolet pick-up truck bearing CA license 8R28848 that was registered to him. Macias opened his driver's side door and showed IC Investigator Rogers a case of watches on his front driver's seat. IC Investigator Rogers noticed approximately six Audemars Piguet watches, four Rolex watches, two Hublot watches, one Armani watch, and one child's watch with an Avenger's

8

logo. During the exchange, SDCSD approached and arrested Macias for violating California Penal Code section 350(a)(2), Possession and Sales of Counterfeit Goods.

18. Macias complied with the arresting officers' instructions. He identified himself as a United States Border Patrol (USBP) Agent and informed the officers that he was armed. Detective Forbes approached Macias and handcuffed Macias without incident. HSI Special Agent Ereme conducted a search of Macias' person and found Macias' agency issued handgun in Macias' waistband and Macias' U.S. Border Patrol (USBP) credentials in his back pocket. SDCSD Sergeant Kerr later turned over Macias' department issued firearm and credentials back to USBP. During the arrest, SDCSD Sergeant Kerr heard Macias state, "I'm going to lose my job." SDCSD seized then thirteen counterfeit watches and $80 in cash found in the display case from Macias.

19. BCST conducted an inventory search of Macias' vehicle. Inside the vehicle, they found an SDG&E receipt for utilities at Macias' recently purchased home in San Diego, California. They also found SUBJECT DEVICE #1 in the cup holder of Macias' vehicle. Macias identified SUBJECT DEVICE #1 as his and voluntarily provided his password when he accessed his phone to provide the address to his new home.

**D.    Macias' Statement**

20. Detective Bravo arrived at the arrest location and took over contact with Macias. Detective Bravo informed Macias of his Miranda rights and of the reason for his arrest. Macias waived his rights. Macias explained that Carlos Montes, his friend who lives in Mexico, collects and advertises these watches on Offer Up, Craigslist, and other websites. Montes asked Macias to deliver the watches for him because he doesn't come up from Mexico. Macias does not know who supplied Montes with watches or where the watches were made. He believes that Montes pays about $110 for each watch because they are high quality. Macias has known Montes for approximately a year and a half.

21. Macias claimed to have delivered watches twice for Montes, both times to the IC Investigators and not to anyone else. He also admitted that the watches were fake except for the Armani and Casio (children's Avengers watch), which were his. Macias later claimed that he could

9

not tell the difference between an authentic and counterfeit Rolex. Macias claimed that he never discussed price with the IC Investigator but said he planned to collect maybe $250. Macias knew that selling counterfeit goods was illegal but thought that it was similar to running a red light.

### E.     Search of Macias' Home

22.     Following the arrest, SDCSD obtained and executed California State search warrant #S17-321 for Macias' home the same day as his arrest. BCST entered the home and they confirmed that no one was home. The search did not yield any further counterfeit or illegal items. However, SUBJECT DEVICE #2 was discovered during the search of the residence inside Macias' backpack and next to Macias' Border Patrol Uniform. Macias claimed ownership of SUBJECT DEVICE #2.

### G.     Authenticity Evaluation and Value of Counterfeit Watches Seized

23.     *Rolex & Hublot:* IC Investigator Vafaeisefat received training from Rolex and Hublot in identifying authentic and counterfeit merchandise. IC Investigator Vafaeisefat analyzed the four Rolex watches and the two Hublot watches seized from Macias when he was arrested and concluded that these watches are counterfeit. IC Investigator Vafaeisefat estimates the value of a similar genuine Hublot watch to be about $17,000 each and the value of a similar genuine Rolex watch to be about $10,000.

24.     *Audemars Piguet:* Audemars Piguet submitted a letter assessing the authenticity of the watches seized from Macias. The letter is signed by Audemars Piguet's Chief Legal Office Nicolas Burgener and Chief Financial Officer Saji Jabbour and is dated August 18, 2017. The letter concludes that five of the six watches are counterfeit and based off of models that Audemars Piguet sells. Audemars Piguet estimates that, if the watches were genuine, two of the watches would sell for $32,000, one would sell for $38,300, another would sell for $69,800, and another would sell for $79,400.

25.     *Armani:* Fossil Group, Inc. which owns the exclusive worldwide license for Armani watches sent an affidavit confirming that the Armani watch seized from Macias is not an authentic Armani watch. The affidavit was signed by Global Brand Protection Leader Negin Saberi

on August 17, 2017. He explained that the logo used on the watch in inconsistent with genuine models.

26. Based on my training and experience and my knowledge of this investigation that persons who participate in the illicit sale of counterfeit items tend to keep in their electronic devices evidence of their criminal activities (e.g., telephone numbers and names of co-conspirators, customers, and suppliers, shipping documents, correspondence, receipts, and ledgers noting the price, quantities, and times illicit items were obtained, transferred, sold, distributed, and concealed). Moreover, I know that persons who participate in the SUBJECT OFFENSE typically maintain these records long after the initial transaction is completed for accountability purposes in their electronic devices.

## IV.

## SEARCH METHODOLOGY

27. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that

have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

28. Following the issuance of this warrant, I will collect the SUBJECT DEVICES and subject them to analysis. All forensic analysis of the data contained within the SUBJECT DEVICES and each SUBJECT DEVICES' memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

29. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## V.

## **CONCLUSION**

30. As SUBJECT DEVICE #1 was found in Macias' vehicle when he was arrested for attempting to sell counterfeit watches a second time to IC Investigators and as Macias arranged the meeting to sell the counterfeit goods via text message, there is a probable cause to believe that Macias used SUBJECT DEVICE #1 to facilitate the offense of Trafficking of Counterfeit Goods or Services. I also believe that probable cause exists to believe that evidence and instrumentalities of the SUBJECT OFFENSE committed by Macias continues to exist on SUBJECT DEVICE #1.

31. In addition, as Macias coordinated with Montes, who is a personal friend and lives in Mexico, probable exists to believe that Macias and Martin may have arranged for and transported counterfeit goods by communicating via SUBJECT DEVICE #2. I therefore also believe that evidence and instrumentalities of the SUBJECT OFFENSE committed by Macias continues to exist on SUBJECT DEVICE #2.

32. Based on the foregoing, I have probable cause to believe that evidence, fruits, or instrumentalities of the SUBJECT OFFENSE will be found at the SUBJECT DEVICES, which

are more fully described in the Attachments A-1 and A-2. I therefore request that the court issue a warrant authorizing a search of the SUBJECT DEVICES described in Attachments A-1 and A-2, for items listed in Attachments B-1 and B-2, and the seizure and examination of any such items found.

_____
Special Agent Matthew Brackett
Department of Homeland Security
Office of Inspector General

Subscribed to and sworn to me
this ___ day of September, 2017

_____
Honorable Judge Barbara L. Major
United States Magistrate Judge

## Attachment A-1

## ITEMS TO BE SEARCHED

**SUBJECT DEVICE #1**

One iPhone 7 Plus Cellular Phone

Model A1784

IMEI number 359219070672269

Currently in the possession of 701 B. Street, Suite 560 San Diego, CA. 92101.

### Attachment B-1 – ITEMS TO BE SEIZED

Authorization to search the SUBJECT DEVICE described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the SUBJECT DEVICE described in Attachment A-1. The seizure and search of the SUBJECT DEVICE described in Attachment A-1 will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the SUBJECT DEVICE described in Attachment A-1 will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of May 1, 2017 to August 3, 2017:

a. tending to indicate efforts to engage in the SUBJECT OFFENSE, including but not limited to the possession, packaging, shipping, sale, purchase, importation, exportation, manufacturing, distribution, and/or negotiation of counterfeit items including but not limited to:

   i. Communications regarding the SUBJECT OFFENSE and/or counterfeit goods;

   ii. Evidence of possible proceeds derived from trafficking or selling counterfeit goods;

   iii. Evidence of the use of United States currency, foreign currency, precious metals, and any and all financial instruments, in the furtherance of counterfeit activities;

   iv. Electronic copies of work sheets, tally sheets, or ledger sheets; personal telephone and address books, papers, and/or other items reflecting names, addresses and/or telephone numbers of associates;

   v. Evidence of the maintenance or use of properties, vehicles, storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures which could be used to store counterfeit goods;

   vi. Evidence of bank account records, wire transfer records, bank statements, tax records, safe deposit box keys and records, money orders, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of counterfeit goods;

   vii. Records relating to the use of and accumulation of cash hoards, including records relating to the sale of goods, legal or illegal, bank records, cashier's check receipts, express delivery receipts/envelopes, rent receipts, money drafts, money orders, and their receipts;

   viii. Evidence of money ledgers, counterfeit items distribution or customer lists, counterfeit items supplier lists, correspondence, notations, logs, receipts, journals, books, records and other documents (in both hardcopy and electronic format) noting the price, quantity, and/or times when counterfeit items were obtained, transferred, sold, distributed, and/or concealed;

     ix. Electronic documents related to the manufacture, purchase and/or sale of counterfeit items;

     x. Evidence of firearms, including handguns, pistols, revolvers, rifles, shotguns, and machine guns, and ammunition;

     xi. Evidence of the location, transportation and/or importation of SUBJECT OFFENSE including GPS coordinates, geolocation information, maps, satellite images, and other location information regarding the SUBJECT OFFENSE;

     xii. Records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses that may be associated with committing the SUBJECT OFFENSE (e.g. Craigslist or other similar websites);

     xiii. Evidence reflecting travel for the purpose of participating in SUBJECT OFFENSE, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

b. tending to identify other facilities, storage devices, or services such as email addresses, IP addresses, phone numbers that may contain electronic evidence tending to indicate efforts to violate the SUBJECT OFFENSE, including possession, packaging, shipping, sale, purchase, importation, exportation, manufacturing, distribution, and negotiation of counterfeit items;

c. tending to identify co-conspirators, criminal associates, or others involved in the purchase, sale, trafficking, importation, exportation, manufacturing, distribution, and/or negotiation dealing with counterfeit goods;

d. tending to identify travel to or presence at locations relating to the purchase, sale, importation, exportation, distribution, packaging, or shipping of counterfeit goods in violation of the SUBJECT OFFENSE;

e. tending to identify or exclude travel to or presence at locations described by MACIAS during the transactions for the counterfeit goods with law enforcement as well as his post-arrest statements;

f. tending to identify the user of, or persons with control over or access to, the subject phone; or

g. ending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

**which are evidence of violations of Title 18, United States Code, Section 2320** (Trafficking of counterfeit goods or services) (referred to as the SUBJECT OFFENSE throughout the affidavit).

2